**LaDonna ANDERSON as Executor of the Estate of Donald Anderson, Plaintiff-Appellant,**

v.

**MARATHON PETROLEUM COMPANY, f/k/a Marathon Oil Company, Defendant-Appellee.**

No. 85–3016.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1986.

Decided Sept. 16, 1986.

---

Robert Brown, Ronald Tulin, Ltd., Charleston, Ill., for plaintiff-appellant.

Gary E. Snodgrass, Brown James & Rabbitt, P.C., St. Louis, Mo., for defendant-appellee.

Before BAUER and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

This diversity personal-injury suit pits two residents of Illinois (Donald Anderson, who died while the case was on appeal, and his widow) against a nonresident corporation, Marathon Petroleum Compa-

ny. The district judge granted a directed verdict for Marathon at the close of the plaintiffs' case on the ground that the plaintiffs had failed to show a breach of duty by Marathon.

Anderson was an employee of Tri-Kote, Inc., which had a contract with Marathon to clean the inside of Marathon's oil storage tanks by sandblasting. The evidence, viewed most favorably to the Andersons, shows that sandblasting in a confined space creates clouds of silicon dust, which if breathed in over a long period of time cause silicosis, a serious lung disease from which, in fact, Anderson died. Anderson had begun working for Tri-Kote in 1970 as a sandblaster, mostly on the Marathon contract, and quit in 1983 when he was diagnosed as suffering from silicosis. During this period he averaged three or four days a week sandblasting Marathon storage tanks. Until 1980 the only form of mask that Tri-Kote supplied Anderson to protect him from silicon dust was a so-called "desert hood." It had no fresh-air hose but only a wire mesh in front of the nose and mouth, and the dust could get in through the mesh. Supervisory personnel of Marathon often saw Anderson coming out of a storage tank with dust on his face after sandblasting and they knew that Tri-Kote had supplied him with just the patently inadequate "desert hood." Yet Marathon did nothing to try to get Tri-Kote to protect its workers better. The two employees of Tri-Kote who sandblasted Marathon's storage tanks before Anderson came on the scene also died of silicosis.

■ The issue is the tort duty of a principal to the employees of his independent contractor. The duty could be vicarious or direct: vicarious if the principal is not himself at fault in the accident to the employee, direct if he is. Mrs. Anderson makes both sorts of claim, though her emphasis is on the former, and that is the one we shall discuss first. The district judge rejected both claims, and our practice is to give some deference to determinations of the law of a state by a district judge sitting in that state. *Enis v. Continental Illinois*

*Nat'l Bank & Trust Co.*, 795 F.2d 39, 40 (7th Cir.1986).

■ Generally a principal is not liable for an independent contractor's torts even if they are committed in the performance of the contract and even though a principal is liable under the doctrine of respondeat superior for the torts of his employees if committed in the furtherance of their employment. See, e.g., *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill.2d 19, 21, 276 N.E.2d 336, 338 (1971); *Kouba v. East Joliet Bank*, 135 Ill.App.3d 264, 267, 89 Ill.Dec. 774, 777, 481 N.E.2d 325, 328 (1985). The reason for distinguishing the independent contractor from the employee is that, by definition of the relationship between a principal and an independent contractor, the principal does not supervise the details of the independent contractor's work and therefore is not in a good position to prevent negligent performance, whereas the essence of the contractual relationship known as employment is that the employee surrenders to the employer the right to direct the details of his work, in exchange for receiving a wage. The independent contractor commits himself to providing a specified output, and the principal monitors the contractor's performance not by monitoring inputs—i.e., supervising the contractor—but by inspecting the contractually specified output to make sure it conforms to the specifications. This method of monitoring works fine if it is feasible for the principal to specify and monitor output, but sometimes it is not feasible, particularly if the output consists of the joint product of many separate producers whose specific contributions are difficult (sometimes impossible) to disentangle. In such a case it may be more efficient for the principal to monitor inputs rather than output—the producers rather than the product. By becoming an employee a producer in effect submits himself to that kind of monitoring, receiving payment for the work he puts in rather than for the output he produces.

Since an essential element of the employment relationship is thus the employer's monitoring of the employee's work, a prin-

cipal who is not knowledgeable about the details of some task is likely to delegate it to an independent contractor. Hence in general, though of course not in every case, the principal who uses an independent contractor will not be as well placed as an employer would be to monitor the work and make sure it is done safely. This is the reason as we have said for not making the principal vicariously liable for the torts of his independent contractors. See Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499, 545 (1961).

■ The rule is not applied, however, when the activity for which the independent contractor was hired is "abnormally dangerous," see Restatement (Second) of Torts § 427A (1964), or in an older terminology "ultrahazardous," see, e.g., *Cities Service Co. v. State*, 312 So.2d 799, 802 (Fla. Dist. Ct.App. 1975)—i.e., if the activity might very well result in injury even if conducted with all due skill and caution. When an activity is abnormally dangerous, it is important not only that the people engaged in it use the highest practicable degree of skill and caution, but also—since even if they do so, accidents may well result—that the people who have authorized the activity consider the possibility of preventing some accidents by curtailing the activity or even eliminating it altogether. See *Bethlehem Steel Corp. v. EPA*, 782 F.2d 645, 652 (7th Cir.1986); Shavell, *Strict Liability versus Negligence*, 9 J. Legal Stud. 1 (1980). On both scores there is an argument for making the principal as well as the independent contractor liable if an accident occurs that is due to the hazardous character of the performance called for by the contract. The fact that a very high degree of care is cost-justified implies that the principal should be induced to wrack his brain, as well as the independent contractor his own brain, for ways of minimizing the danger posed by the activity. And the fact that the only feasible method of accident prevention may be to reduce the amount of the activity or substitute another activity argues for placing liability on the principal, who makes the decision whether to undertake the activity in the first place. The electrical utility that has to decide whether to transport nuclear waste materials by motor or rail may be influenced in its choice by the relative safety of the modes—if it is liable for the consequences of an accident.

True, the principal would in any event be liable indirectly if the price it paid the independent contractor fully reflected the dangers of the undertaking; but this condition would be fulfilled only if the contractor were fully answerable for an accident if one occurred. And though fully liable in law, the independent contractor would not be fully liable in fact if a damage judgment would exceed his net assets. The likelihood of the independent contractor's insolvency is greater the more hazardous the activity; by definition, expected accident costs are greater. Another thing making them greater is that the contractor will be strictly liable for accidents caused by the abnormally dangerous character of his activity, see Restatement, *supra*, § 427A, comment, a, and therefore his expected legal-judgment costs will be higher than those of a contractor liable only for negligence. With the exposure of the independent contractor to liability so great, it may be necessary to make the principal liable as well in order to ensure that there is a solvent defendant. This is important not only to provide compensation for accident victims but also to reduce the number of accidents. Without such liability a principal might hire judgment-proof independent contractors to do his dangerous jobs, knowing that the contractors would have an incentive to cut corners on protecting safety and health and that this would reduce the cost of the contract to him. See Sykes, *The Economics of Vicarious Liability*, 93 Yale L.J. 1231, 1241–42, 1272 (1984).

■ Is sandblasting abnormally dangerous? A district judge in Louisiana, in the only case we have found on the question, held not. *Touchstone v. G.B.Q. Corp.*, 596 F.Supp. 805, 815 (E.D. La. 1984). In the absence of any precedent establishing the

abnormal dangerousness of sandblasting, the plaintiffs in this case were obliged to lay a factual basis for an inference that people engaged in sandblasting cannot prevent a serious risk of injury by taking precautions. They did not do this. So far as the record shows (an important qualification), if the sandblaster is equipped not with the riduculous "desert hood" but with a proper face mask to which a fresh-air hose is attached, so that the worker is breathing fresh air rather than air filled with silicon dust, the worker is in no danger, nor anyone else. The design of an effective hood may be more difficult than we are assuming it to be, cf. *Byrd v. Hunt Tool Shipyards, Inc.,* 650 F.2d 44, 48 (5th Cir.1981), but in the absence of precedent or data we cannot just assume that the protection of the worker is so difficult that sandblasting should be classified as abnormally dangerous.

Mrs. Anderson presses on us cases which suggest that something less than abnormal danger may be enough to take a case out of the rule that a principal is not liable for the torts of its independent contractors. An example is *Johnson v. Central Tile & Terrazzo Co.,* 59 Ill.App.2d 262, 276–77, 207 N.E.2d 160, 167 (1965), which says that "if one employs another to do work which he should recognize as involving some peculiar risk to others unless special precautions are taken, the one doing the employing will remain liable if harm results because these precautions are not taken," even though the person "employed" is actually an independent contractor. See also *Donovan v. Raschke,* 106 Ill.App.2d 366, 370, 246 N.E.2d 110, 113 (1969); 5 Harper, James & Gray, The Law of Torts § 26.11, at pp. 88–89 (2d ed. 1986). The words "peculiar risk" bring to mind section 416 of the Restatement. And the closely related section 427 speaks of a danger that is "inherent," a concept apparently distinguishable in the restaters' minds from the "abnormally dangerous" concept of 427A (an *a fortiori* ground for not allowing the principal to shift his duty of care to the independent contractor). This concept, too, is echoed in Illinois cases, such as *Clark v. City of Chicago,* 88 Ill.App.3d 760, 763–64, 43 Ill.Dec. 892, 895, 410 N.E.2d 1025, 1028 (1980)—but *Clark* seems to treat the terms as synonymous. On the general question see the lucid discussion in Prosser and Keeton on the Law of Torts § 71, at pp. 512–15 (5th ed. 1984).

The distinction between an abnormal risk on the one hand and a peculiar or inherent risk on the other hand is easiest to understand in situations where the activity, though not always or generally hazardous, is so in the particular case. Thus in *Donohue v. George W. Stiles Construction Co.,* 214 Ill.App. 82, 89–91 (1919), discussed and distinguished in *Johnson,* the prime contractor hired a subcontractor to do structural steel repair work in a post office, right over the heads of the postal employees—and sure enough, one of them was injured. The present case is dissimilar. And even if the present case is within the "peculiar risk" or "inherent danger" exception as recognized by the Illinois cases, Mrs. Anderson must lose. With rare exceptions, some based on statutes such as the omnipresent scaffolding acts (see, e.g., Ill.Rev.Stat. ch. 48, ¶¶ 60 *et seq.)* that impose strict liability on contractors for injuries to their subcontractors' employees caused by hazardous working conditions, the cases that make principals vicariously liable for the torts of their independent contractors involve injuries to third parties rather than employees; and the general though not uniform view is that the employee has no common law tort right against his employer's principal in such a case. See, e.g., *Conover v. Northern States Power Co.,* 313 N.W.2d 397, 404–06 (Minn.1981); *Sloan v. Atlantic Richfield Co.,* 552 P.2d 157, 159–60 (Alaska 1976); *Johns v. New York Blower Co.,* 442 N.E.2d 382, 386–88 (Ind.App.1982); Prosser and Keeton on the Law of Torts, *supra,* at 514 n. 63; 5 Harper, James & Gray, *supra,* § 26.11, at p. 82 n. 47 (third paragraph of note). Granted, *Fried v. United States,* 579 F.Supp. 1212 (N.D.Ill.1983), is an exception, and it purports to be an interpretation of Illinois law; but the only cases on which

the court relied involved injuries to nonemployees, see *id.* at 1216, and the court did not seem aware that this might make all the difference. There are other exceptional cases, but the majority view as we have said is against such liability.

·There is a reason for the distinction between the plaintiff who is an employee of the independent contractor and the plaintiff who is not. If a nuclear reactor blows up and thousands of people are irradiated, we would not allow the reactor company to slough off all liability for the accident onto a careless independent contractor, who, not having the resources to compensate the victims of his tort, had lacked adequate incentives to take care. Similarly, we would not want Marathon to be able to avoid liability to its neighbors caused by its hiring contractors, who turn out to be careless, to perform abnormally dangerous jobs. But the only people endangered in this case were the contractor's employees; and they are compensated for the risks of their employment by a combination of wages, benefits, and entitlement to workers' compensation in the event of an accident. The principal pays for the package indirectly, in the contract price, which is calculated to cover the contractor's labor as well as other costs. Moreover, as we shall see, if the contractor does not carry workers' compensation insurance and proves unable to pay benefits out of its own pocket, the principal must pay the benefits. The principal thus has every incentive to assure safe working conditions in order to reduce its contract costs and its contingent liability for workers' compensation; so there is no danger of the shell game that is played when the firm causing the accident is insolvent and its principal is not liable because the tortfeasor was an independent contractor rather than an employee.

Since the principal is the indirect employer of its contractor's employees, to make the principal liable in common law tort for the accidents befalling those employees would be inconsistent with the bedrock principle that workers' compensation rights are exclusive of common law tort rights. It is true that workers are allowed to maintain product liability suits against the suppliers of machines that injure them on the job, thereby bypassing in an economic if not legal sense the exclusivity of workers' compensation rights. See, e.g., *Dukes v. J.I. Case Co.,* 137 Ill.App.3d 562, 91 Ill.Dec. 710, 483 N.E.2d 1345 (1985). But the supplier of a machine is not an indirect employer of the workers who man the machine; the employer's principal is.

Mrs. Anderson presses on us the Illinois Supreme Court's decision in *Chicago Economic Fuel Gas Co. v. Myers,* 168 Ill. 139, 146, 48 N.E. 66, 68 (1897), which applied in favor of an employee of the independent contractor an "intrinsically dangerous" exception to the rule that a principal is not liable for its independent contractor's torts. But the case was decided before the first workmen's compensation law was enacted in Illinois and is in any event distinguishable from the present case because the "independent" contractor was an alter ego of the principal, cf. *Northern Indiana Public Service Co. v. Carbon County Coal Co.,* 799 F.2d 265, 271 (7th Cir.1986).

■ The position urged by Mrs. Anderson would bring about profound changes in liability for industrial accidents. Firms engaged in activities that are dangerous if proper precautions are not taken (and which activity is not?) would become the virtual insurers of their contractors' employees. Indeed, imagine a case where a homeowner hired a contractor to fix the roof, and one of his workers fell off the roof and was injured. The risk of falling would be in some sense inherent in or peculiar to the work; could the worker therefore sue the homeowner? That would be a revolution in liability. Even if the principal's vicarious liability to its independent contractors' employees were confined to firms, there would be (besides the problems already discussed) the problem of reconciling such liability with the provision of Illinois workmen's compensation law that any firm which engages in "extra hazardous" activities, including "maintaining ... any structure" (which would appear to cover

what Anderson was doing, cf. *Fefferman v. Industrial Comm'n,* 71 Ill.2d 325, 16 Ill.Dec. 935, 375 N.E.2d 1277 (1978)) is liable to the independent contractor's employees for workers' compensation benefits if the contractor himself turns out not to be insured. See Ill.Rev.Stat. ch. 48, ¶¶ 138.-1(a)(3), 138.3(1), 138.11. It would be odd if the principal, while liable at most for workmen's compensation benefits if the contractor was not insured, would be liable for common law tort damages—which are usually much greater than workers' compensation benefits—if the contractor was insured.

▪ Up to now we have treated the case as one in which the principal is alleged to be vicariously liable for its contractors' torts, but Mrs. Anderson also argues that there was enough evidence of Marathon's negligence to make the directed verdict improper even if Tri-Kote's negligence cannot be imputed to Marathon. Supervisory employees of Marathon testified that on occasion they had seen Mr. Anderson coming out of the storage tanks with dust on his face, and they knew he did not have an adequate mask. Even so, this does not show that Marathon was negligent in hiring Tri-Kote initially; so this conventional avenue of principal's liability, see, e.g., *Gomien v. Wear-Ever Aluminum, Inc.,* supra, 50 Ill.2d at 21, 276 N.E.2d at 338; Restatement, supra, § 411; Prosser and Keeton on the Law of Torts, supra, at 510, is cut off.

▪ But suppose that a principal, having hired an independent contractor after a careful investigation which showed that the contractor was careful and responsible, discovers that he is careless yet takes no steps to correct his unsafe practices or terminate him; can the victim of the contractor's carelessness get damages from the principal? We assume the answer is "yes" if the victim is a third party, but Mrs. Anderson has cited no case in which an Illinois court has allowed an employee of the independent contractor to recover damages on this basis. The majority view is that he may not. See *Eutsler v. United States,* 376 F.2d 634 (10th Cir.1967); *Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030, 1033–34 (5th Cir.1977); *Futo v. Lykes Bros. S.S. Co.,* 742 F.2d 209, 214 (5th Cir.1984). Again the reason is that the employee is protected by his workers' compensation rights; again there is a division of authority (see the comprehensive discussion in *Nelson v. United States,* 639 F.2d 469 (9th Cir.1980)); again we have no reason to think that Illinois would adopt the minority view. It might; but federal court is not the place to press innovative theories of state law. This precept is particularly *apropos* in a case such as this where residents file suit in federal court against a nonresident defendant. The choice of the federal forum in such a case cannot be laid to fear of prejudice against a nonresident. The plaintiff is not the nonresident—the defendant is. (It would be different if the Andersons had filed this suit in state court and Marathon had removed it to federal court.) The plaintiffs' appellate counsel could not remember why this suit was brought in federal rather than state court, so we take this occasion to remind that resident litigants who seek adventurous departures in state common law are advised to sue in state rather than federal court.

AFFIRMED.

SWYGERT, Senior Circuit Judge, dissenting.

The majority's cost/benefit analysis does not provide an adequate basis for rejecting the holding in *Chicago Economic Fuel Gas Co. v. Myers,* 168 Ill. 139, 146, 48 N.E. 66, 68–69 (1897), in which the Illinois Supreme Court held that employers of independent contractors owe a nondelegable duty to the contractor's employees when those employees are involved in inherently dangerous work or work which carries with it a peculiar risk of injury. Although the majority is correct that *Myers* involved a finding of *alter ego,* that finding was merely an alternative holding to the one set forth above and therefore does not undermine its validity.

The majority suggests that the position taken by the Illinois Supreme Court in *Myers* is now untenable in light of recent developments, most notably the advent of worker's compensation. But other jurisdictions have continued to adhere to the rule reiterated in *Myers* even after worker's compensation developed, the reason being that there are policy considerations apart from worker's compensation coverage that come to play in cases such as the one at bar. *See* discussion in *Johns v. New York Blower Co.,* — Ind.App. —, —, 442 N.E.2d 382, 387 (1984) (quoting *Van Arsdale v. Hollinger,* 68 Cal.2d 245, 66 Cal. Rptr. 20, 25, 437 P.2d 508, 513 (1968)); *see also Johns,* — Ind.App. at —, 442 N.E.2d at 388 (Staton, J., concurring) ("[C]overage by Workmen's Compensation is irrelevant to the issue of liability. If there is a nondelegable duty, a third party is liable for the injuries and damages resulting regardless of Workmen's Compensation coverage.... Workmen's Compensation coverage in many cases may be grossly inadequate where a nondelegable duty is involved.").

Given this, we ought to think very carefully before rejecting *Myers* out of hand. This is particularly true since another district court sitting in Illinois found, although admittedly without much explanation, that under Illinois law the employer's nondelegable duty runs to the contractor's employees. *See Fried v. United States,* 579 F.Supp. 1212, 1216 (N.D.Ill.1983). Moreover, application of *Myers* only gives the plaintiff a cause of action. It does not subject Marathon to automatic liability. The jury must first determine that the sandblasting involved here was "inherently dangerous" and that Marathon breached its nondelegable duty before Marathon will be held liable. Thus, the majority's dire prediction that homeowners will be subject to unlimited liability is highly unlikely to come true since juries are unlikely to find that routine household maintenance is an inherently hazardous activity.

Thus, the question becomes whether sandblasting is "peculiarly or inherently dangerous." In Illinois the question whether an instrumentality or conduct is inherently or peculiarly dangerous is not answered by looking solely at its inherent nature, but also at the manner of its particular use at the time and place of the occurrence. *See Donovan v. Raschke,* 106 Ill. App.2d 366, 370, 246 N.E.2d 110, 113 (1st Dist.1969); *Snow v. Judy,* 96 Ill.App.2d 420, 423, 239 N.E.2d 327 (4th Dist.1968); *Johnson v. Central Tile & Terrazzo Co.,* 59 Ill.App.2d 262, 276–77, 207 N.E.2d 160, 167 (1965). At trial the plaintiffs presented the following expert testimony. Their medical expert testified that

> silica in the lungs is a toxic poison, and that in an area of really intense exposure, where there is not good ventilation, where the particle concentration is extremely high, the only acceptable kind of prevention is an external air source used throughout the procedure with a tight fitting hood [and] external oxygen source or backpack oxygen ... [where the concentration of silica particles is intense], you have to use more and more rigorous methods to protect against exposure.

In this case, there was also additional evidence that Anderson sandblasted three to four times a week in tanks no more than twelve feet in diameter and fifteen feet high, using approximately 2000–2500 pounds of sand, and that Anderson used only a tarpaulin head covering with no fresh air supply. In Illinois, the question of whether an activity is inherently or peculiarly dangerous is one for a jury, *see, e.g., Snow,* 96 Ill.App.2d at 423–24, 239 N.E.2d at 329–30, and the Andersons certainly presented sufficient evidence to reach the jury on this issue.

Thus, because I agree with the majority that there was insufficient evidence of Marathon's negligent retention of the independent contractor, the order of the district court directing a verdict in favor of Marathon on the issue of its alleged breach of its nondelegable duty should be reversed and the cause remanded for a new trial.